FISHER *v.* DISTRICT COURT OF THE SIX-
TEENTH JUDICIAL DISTRICT OF MONTANA,
IN AND FOR THE COUNTY OF ROSEBUD

No. 75–5366.   Decided March 1, 1976

PER CURIAM.

Disagreeing with an advisory opinion of the Appellate Court of the Northern Cheyenne Tribe, the Montana Supreme Court held that the state court has jurisdiction over an adoption proceeding in which all parties are members of the Tribe and residents of the Northern Cheyenne Indian Reservation. We reverse.

Petitioner is the mother of Ivan Firecrow. On July 1, 1969, after petitioner and Ivan's father were divorced, the Tribal Court of the Northern Cheyenne Tribe found that petitioner had neglected Ivan, awarded temporary custody to Josephine Runsabove, and made Ivan a ward of the court.[1] In 1973 the Tribal Court rejected petitioner's request to regain custody of her son.[2] On August 30, 1974, however, the Tribal Court entered an order granting petitioner temporary custody of Ivan "for a period of six weeks during the summer months."[3]

Four days before the entry of that order, Josephine Runsabove and her husband initiated an adoption proceeding in the District Court for the Sixteenth Judicial District of Montana.[4] Petitioner moved to dismiss for lack of subject-matter jurisdiction, asserting that the

---

[1] See *State ex rel. Firecrow* v. *District Court,* —— Mont. ——, ——, 536 P. 2d 190, 192 (1975).

[2] *In re Firecrow* (Northern Cheyenne Tribal Ct., filed Aug. 1, 1973). Defendant's Exhibit C.

[3] *In re Firecrow* (Northern Cheyenne Tribal Ct., filed Aug. 30, 1974). Defendant's Exhibit A.

[4] They alleged that petitioner had voluntarily abandoned the child to Josephine Runsabove on June 2, 1969, and had not supported the child for over a year. The natural father consented to the adoption and waived further notice.

Tribal Court possessed exclusive jurisdiction. After a hearing, the District Court certified to the Appellate Court of the Northern Cheyenne Tribe the question whether an ordinance of the Northern Cheyenne Tribe [5] conferred jurisdiction upon the District Court. The Appellate Court of the Tribe expressed the opinion that it did not,[6] and the State District Court dismissed for lack of jurisdiction.

---

[5] Chapter 3, § 2, of the Revised Law and Order Ordinances of the Northern Cheyenne Tribe of the Northern Cheyenne Reservation, approved by the Commissioner of Indian Affairs, June 9, 1966. The ordinance provides:

"The Tribal Court of the Northern Cheyenne Reservation shall have jurisdiction to hear, pass upon, and approve applications for adoptions among members of the Northern Cheyenne Tribe.

"Upon proper showing and decision by the court, such adoptions shall be binding upon all concerned and hereafter only adoptions so approved by the Tribal Court shall be recognized.

"On all adoptions involving non-members of the Northern Cheyenne Tribe or non-Indians or both who wish to adopt a member of the Northern Cheyenne Tribe, the Tribal Court of the Northern Cheyenne Reservation shall have concurrent jurisdiction to hear, pass upon, and approve applications for adoption and upon written consent of the court, adoption proceedings affecting members of the Northern Cheyenne Tribe of the Northern Cheyenne Reservation may be taken up and consummated in the State Courts."

[6] The opinion of the Appellate Court of the Northern Cheyenne Tribe reads, in relevant part:

"It is the opinion of this Court, and this Court so rules, that the Tribal Court has exclusive jurisdiction of all adoptions of members of the Northern Cheyenne Tribe of Indians where it appears that the minor who is being adopted and all other parties to the adoption proceedings, which is to say, the parent and/or parents of the minor and the person and/or persons adopting said minor are each and all members of the Northern Cheyenne Tribe and each and all reside within the exterior boundaries of the Northern Cheyenne Indian Reservation.

"This Court has not been called upon to decide any issue involving non-members of the Northern Cheyenne Tribe or non-Indians or both, who wish to adopt a member of the Northern Cheyenne

The Runsaboves then filed an original application in the Montana Supreme Court for a writ of supervisory control or other appropriate writ to set aside the order of dismissal. The Montana Supreme Court granted the requested relief, holding that the District Court possessed jurisdiction. The court reasoned that prior to the organization of the Northern Cheyenne Tribe in 1935, the Montana courts possessed jurisdiction over adoptions involving tribal members residing on the reservation and that this jurisdiction could not be unilaterally divested by tribal ordinance; that Congress recognized that jurisdiction of state courts over Indian adoptions in 25 U. S. C. § 372a; and that depriving the Montana courts of jurisdiction would deny equal protection to Indian plaintiffs, at least under the Montana Constitution. *State ex rel. Firecrow* v. *District Court,* — Mont. —, 536 P. 2d 190 (1975).[7]

Tribe. Therefore, this Court does not make any opinion or interpretation as to the provisions of the last (3rd) paragraph of said Section 1 of Chapter III of the Tribal Code." *In re Firecrow,* at 5 (filed Apr. 12, 1975).

[7] The writ of supervisory control issued by the Montana Supreme Court is a final judgment within our jurisdiction under 28 U. S. C. § 1257 (3). It is available only in original proceedings in. the Montana Supreme Court, Mont. Const., Art. VII, §§ 2 (1), (2); Mont. Rule App. Civ. Proc. 17 (a), and although it may issue in a broad range of circumstances, it is not equivalent to an appeal. See *ibid.; State ex rel. Amsterdam Lumber, Inc.* v. *District Court,* 163 Mont. 182, 186–187, 516 P. 2d 378, 380–381 (1973); *Walker* v. *Tschache,* 162 Mont. 213, 215–217, 510 P. 2d 9, 10–11 (1973). A judgment that terminates original proceedings in a state appellate court, in which the only issue decided concerns the jurisdiction of a lower state court, is final, even if further proceedings are to be had in the lower court. *Madruga* v. *Superior Court,* 346 U. S. 556, 557 n. 1 (1954); *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 565–568 (1947); *Bandini Co.* v. *Superior Court,* 284 U. S. 8, 14–15 (1931); see *Costarelli* v. *Massachusetts,* 421 U. S. 193, 197–199 (1975) (*per curiam*).

In litigation between Indians and non-Indians arising out of conduct on an Indian reservation, resolution of conflicts between the jurisdiction of state and tribal courts has depended, absent a governing Act of Congress, on "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams* v. *Lee,* 358 U. S. 217, 220 (1959); accord, *Kennerly* v. *District Court of Montana,* 400 U. S. 423, 426–427 (1971) (*per curiam*). Since this litigation involves only Indians, at least the same standard must be met before the state courts may exercise jurisdiction. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 168–173, 179–180 (1973).

The right of the Northern Cheyenne Tribe to govern itself independently of state law has been consistently protected by federal statute. As early as 1877, Congress ratified an agreement between the Tribe and the United States providing that "Congress shall, by appropriate legislation, secure to [the Indians] an orderly government; they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person, and life." 19 Stat. 256. This provision remained unaffected by the Act enabling Montana to enter the Union,[8] and by the other statutes specifically concerned with the Northern Cheyenne Tribe.[9]

---

[8] Act of Feb. 22, 1889, 25 Stat. 676. Section 4 (2) of the Act provides that "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States . . . ." For an interpretation of this provision, and similar language in other statehood enabling Acts, see *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 175–176, and n. 15 (1973); *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 69–71 (1962).

[9] The Northern Cheyenne Tribe first came under federal trusteeship by the Treaty of May 10, 1868, 15 Stat. 655, which was subsequently modified by the agreement quoted in text. The Northern

In 1935, the Tribe adopted a constitution and bylaws [10] pursuant to § 16 of the Indian Reorganization Act, 48 Stat. 987, 25 U. S. C. § 476, a statute specifically intended to encourage Indian tribes to revitalize their self-government. *Mescalero Apache Tribe, supra,* at 151. Acting pursuant to the constitution and bylaws, the Tribal Council of the Northern Cheyenne Tribe established the Tribal Court and granted it jurisdiction over adoptions "among members of the Northern Cheyenne Tribe." [11]

State-court jurisdiction plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court. It would subject a dispute arising on the reservation among reservation Indians to a forum other than

Cheyenne Indian Reservation was created by Executive Orders on November 26, 1884, and March 19, 1900, 1 C. Kappler, Indian Affairs 860–861 (1904), and it was confirmed as property of the Tribe held in trust by the United States by the Act of June 3, 1926, c. 459, 44 Stat. pt. 2, 690. None of the cited sources grants jurisdiction to Montana.

[10] Constitution and bylaws of the Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, approved by the Secretary of the Interior, Nov. 23, 1935. These have since been superseded by the Amended Constitution and By-Laws of the Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, approved by the Assistant Secretary of the Interior, July 8, 1960.

[11] C. 3, § 2, of the Revised Law and Order Ordinances of the Northern Cheyenne Tribe of the Northern Cheyenne Reservation. Quoted at n. 5, *supra.*

The third paragraph of § 2 does not confer jurisdiction over this case upon the Montana courts. By its express terms, it confers concurrent jurisdiction only over "adoptions involving non-members of the Northern Cheyenne Tribe or non-Indians or both who wish to adopt a member of the Northern Cheyenne Tribe," see n. 5, *supra,* and only upon written consent of the Tribal Court.

the one they have established for themselves.[12]  As the present record illustrates, it would create a substantial risk of conflicting adjudications affecting the custody of the child and would cause a corresponding decline in the authority of the Tribal Court.

No federal statute sanctions this interference with tribal self-government.  Montana has not been granted, nor has it assumed, civil jurisdiction over the Northern Cheyenne Indian Reservation, either under the Act of Aug. 15, 1953, 67 Stat. 588, or under Title IV of the Civil Rights Act of 1968, 82 Stat. 78, 25 U. S. C. § 1321 *et seq.*  And contrary to the Runsaboves' contention, 25 U. S. C. § 372a [13] manifests no congressional intent to

_____

[12] Neither the constitution and bylaws nor the ordinance of the Northern Cheyenne Tribe manifests an intent to cede jurisdiction to Montana.  This factor alone distinguishes the decisions upon which the Montana Supreme Court relied.  *Bad Horse* v. *Bad Horse,* 163 Mont. 445, 450–451, 517 P. 2d 893, 896, cert. denied, 419 U. S. 847 (1974); *State ex rel. Iron Bear* v. *District Court,* 162 Mont. 335, 337–338, 342–343, 512 P. 2d 1292, 1294, 1297 (1973).  We do not decide, however, whether an enactment of a tribal council prior to the effective date of Pub. L. 280, Act of Aug. 15, 1953, 67 Stat. 588, may be sufficient to confer jurisdiction upon the state courts.  See *Kennerly* v. *District Court of Montana,* 400 U. S. 423, 426–429 (1971) *(per curiam)*; *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 179–180.

[13] Act of July 8, 1940, c. 555, §§ 1, 2, 54 Stat. 746.  The statute provides:

"[Sec. 1]  [I]n probate matters under the exclusive jurisdiction of the Secretary of the Interior, no person shall be recognized as an heir of a deceased Indian by virtue of an adoption—

"(1) Unless such adoption shall have been—

"(a) by a judgment or decree of a State court;

"(b) by a judgment or decree of an Indian court; ·

"(c) by a written adoption approved by the superintendent of the agency having jurisdiction over the tribe of which either the adopted child or the adoptive parent is a member, and duly recorded in a book kept by the superintendent for that purpose; or

"(d) by an adoption in accordance with a procedure established

confer jurisdiction upon state courts over adoptions by Indians. The statute is concerned solely with the documentation necessary to prove adoption by an Indian in proceedings before the Secretary of the Interior. It recognizes adoption "by a judgment or decree of a State court" as one means of documentation but nowhere addresses the jurisdiction of state courts to render such judgments or decrees. The statute does not confer jurisdiction upon the Montana courts. See *McClanahan,* 411 U. S., at 174–175; *Williams,* 358 U. S., at 220–221.

Since the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation, the jurisdiction of the Tribal Court is exclusive. The Runsaboves have not sought to defend the state court's jurisdiction by arguing that any substantial part of the conduct supporting the adoption petition took place off the reservation. Cf. *DeCoteau* v. *District County Court,* 420 U. S. 425, 428–430, and n. 3 (1975).[14]

by the tribal authority, recognized by the Department of the Interior, of the tribe either of the adopted child or the adoptive parent, and duly recorded in a book kept by the tribe for that purpose; or

"(2) Unless such adoption shall have been recognized by the Department of the Interior prior to the effective date of this Act or in the distribution of the estate of an Indian who has died prior to that date: *Provided,* That an adoption by Indian custom made prior to the effective date of this Act may be made valid by recordation with the superintendent if both the adopted child and the adoptive parent are still living, if the adoptive parent requests that the adoption be recorded, and if the adopted child is an adult and makes such a request or the superintendent on behalf of a minor child approves of the recordation.

"SEC. 2. This Act shall not apply with respect to the distribution of the estates of Indians of the Five Civilized Tribes or the Osage Tribe in the State of Oklahoma, or with respect to the distribution of estates of Indians who have died prior to the effective date of this Act."

[14] The Runsaboves alleged as grounds for adoption that petitioner

The remaining points may be dealt with briefly. The Runsaboves argue that the ordinances of the Northern Cheyenne Tribe could not deprive the Montana courts of the jurisdiction they exercised over tribal matters prior to organization of the Tribe in 1935. The tribal ordinance conferring jurisdiction on the Tribal Court was authorized by § 16 of the Indian Reorganization Act, 25 U. S. C. § 476. Consequently, it implements an overriding federal policy which is clearly adequate to defeat state jurisdiction over litigation involving reservation Indians. Accordingly, even if we assume that the Montana courts properly exercised adoption jurisdiction prior to the organization of the Tribe, a question we do not decide, that jurisdiction has now been pre-empted.

Finally, we reject the argument that denying the Runsaboves access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law. Moreover, even if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-

---

had abandoned Ivan and given custody to Josephine Runsabove and that petitioner had not supported the child for over a year. Since all parties resided on the reservation at all relevant times, and since the reservation has not been partially terminated, cf. *DeCoteau* v. *District County Court,* 420 U. S., at 429 n. 3, it appears that none of the acts giving rise to the adoption proceedings occurred off the reservation. The Runsaboves do not contend otherwise. They do, however, point out that the birth of Ivan and the marriage and divorce of his parents occurred off the reservation. These facts do not affect our conclusion that the adoption proceeding is within the Tribal Court's exclusive jurisdiction. In a proceeding such as an adoption, which determines the permanent status of litigants, it is appropriate to predicate jurisdiction on the residence of the litigants rather than the location of particular incidents of marginal relevance, at best.

Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government. *Morton* v. *Mancari,* 417 U. S. 535, 551–555 (1974).

The motion of the Northern Cheyenne Tribe for leave to file a brief, as *amicus curiae,* is granted. The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Supreme Court of Montana is reversed.

*It is so ordered.*