TOBY E. SHERRY, Commissioner Office of Commissioner of Banking
You requested my opinion on several related issues: (1) whether your office's authority to regulate consumer bank communications terminals ("ATMs") pursuant to section 221.04(1)(k) of the Wisconsin statutes extends to ATMs located on Indian land; and (2) whether your office would have the authority to regulate various banking enterprises, owned either by tribal or nontribal members, if they were to operate on Indian land. Specifically, you inquire as to whether your office would be able to approve and deny license applications pursuant to section 218.01, issue licenses to sellers of checks pursuant to chapter 217, issue licenses dealing with precomputed loans pursuant to section138.09 and issue licenses for currency exchanges pursuant to section 218.05.
Although there is no absolute barrier to the exercise of state jurisdiction within reservation boundaries, jurisdiction may be exercised only when the state can establish a significant interest which outweighs any federal or tribal interest. The United States Supreme Court recently summarized the analytical framework utilized to determine under what circumstances a state's regulatory authority may lawfully be extended within reservation boundaries.
In White Mountain Apache Tribe v. Bracker, 448 U.S. 136
(1980), the Court noted that it long ago departed from the early view that state laws can have no force within reservation boundaries. Rather, the question whether a particular state law *Page 338 
may be applied within an Indian reservation boundary or to tribe members requires a particularized inquiry into the nature of the state, federal and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.
The Court concluded:
 Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3. This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop" against which vague or ambiguous federal enactments must always be measured.
Bracker, 448 U.S. at 142-43 (citations omitted).
Unquestionably, the application of these principles in resolving jurisdictional questions is materially affected by the status of the land tenure where enforcement is sought and the identity of the persons or entity being regulated.
If, therefore, an institution which has its principal place of business off reservation seeks to place ATMs on a reservation, the state has authority to regulate such activity. MescaleroApache Tribe v. Jones, 411 U.S. 145 (1973). *Page 339 
When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable because the state's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self government is at its strongest. See Bracker; Moe v. Confederated Salish KootenaiTribes, etc., 425 U.S. 463 (1976); McClanahan v. State TaxCommission of Arizona, 411 U.S. 164 (1973); Montana v. UnitedStates, 450 U.S. 544 (1981). In such situations, state laws generally are not applicable to tribe members or Indian activities on a reservation except where Congress has expressly provided that they shall apply. McClanahan, 411 U.S. at 170-71;U.S. v. John, 437 U.S. 634 (1978); and Fisher v. Dist. Court ofSixteenth Jud. Dist., 424 U.S. 382 (1976).
I am not aware of any federal law which specifically authorizes Wisconsin to enforce civil/regulatory statutes on the reservations. The United States Supreme Court has adopted lower court reasoning that limits Public Law 280 (67 Stat. 588, codified at 18 U.S.C.A. § 1162 (West 1984)), the only grant of jurisdiction to Wisconsin, to state criminal/prohibitory statutes. Under the Supreme Court's reasoning, only statutes which violate the states' public policy and are prohibitory in nature apply on the reservations. Statutes which permit the activity with regulation do not apply. California v. Cabazon Bandof Mission Indians, 480 U.S. 202 (1987).
It is clear that chapters 217 and 218 and sections 138.09 and895.055 are all purely regulatory in nature. Therefore, these regulatory statutes fall outside the scope of Public Law 280's grant of jurisdiction to Wisconsin.
However, in my view, Wisconsin has a significant interest in applying regulatory statutes concerning ATMs and banking which outweigh any federal or tribal interest. Since the advent of gaming on Indian reservations, the increase in non-Indian traffic and the likelihood of non-Indians using ATMs and other banking facilities on the reservations for the purpose of obtaining funds while on the reservations is significant. The *Page 340 
state has a compelling interest in regulating ATMs and various other banking activities as to non-Indians on the reservations. As state citizens and consumers, they are entitled to the same type of protection and oversight from the state on the reservations as the state provides to citizens and consumers off the reservations.
Additionally there is a substantial state and federal interest in uniformity and public trust in the regulation of banking activities. State regulation of such activity would therefore advance both federal and state interests in fostering such uniformity and public trust. It seems it would also be in the tribes' interest to establish uniformity and public trust with respect to any banking activities undertaken by the tribes.
Lastly, there is considerable interplay between banking systems throughout the world. Individuals who maintain accounts in Wisconsin may use ATMs in foreign countries, other states and on the reservations which affect their accounts in local banking institutions. Of necessity, any banking activity, including ATMs on the reservations, will interact with both federal and state banking systems, all of which are subject to federal and/or state regulation.
In view of the likely use of banking activities on the reservations by non-Indians, the highly regulated nature of banking, and the interplay between any banking activity on the reservations and both state and federally regulated systems off the reservations, I believe Wisconsin has a compelling interest in applying its statutory regulations to banking activities on the reservations.
JED:WDW *Page 341